IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STEVEN L.D. GRADE, | ) | 4:09CV3162 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

On the night of December 29, 2006, the plaintiff, Steven L.D. Grade, drove his vehicle into the side of a flatbed railcar at the B Street crossing in Hastings, Nebraska. The railcar formed part of a train operated by the defendant, Burlington Northern Railroad Company ("BNSF"). The train was stopped at BNSF's Hastings rail yard for a crew change and to remove one of the train's three locomotives from the consist. Grade claims the accident was caused by the negligence of BNSF:

(a) In failing to maintain a proper lookout for the motoring public who were lawfully using B [S]treet;
(b) In failing to have its rolling stock under reasonable and proper control and supervision;
(c) In failing to break the parked flat cars at the crossing and move said cars a safe distance north or south of said grade crossing;
(d) In failing to have a flagman, or other railroad personnel, or to have appropriate automated audible, flashing or refectory [sic] warning devices at the crossing or on the flatcars in order to alert oncoming motorists on B [S]treet that the flatcars were blocking the grade crossing;
(e) By blocking said grade crossing with unattended and parked flatcars for more then ten minutes without breaking and removing said cars from the grade crossing;
(f) In failing to maintain the B Street Crossing with a mounted flashing light and bell warning signal;
(g) In failing to install a mounted flashing light and bell warning signal at the B Street Crossing; and

  (h) In marking the B Street Crossing with a cross-buck sign and not a cross arm devise [sic] with a flashing light.

(Complaint (filing 1-2), ¶ 7.) [1]

BNSF has moved for summary judgment and argues, among other things, that these state-law negligence claims are preempted by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq.* For the reasons discussed below, BNSF's motion will be granted and judgment will be entered dismissing the action with prejudice.

Under the FRSA's express preemption provision, "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). "A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2).[2] A state-law negligence action is "covered" and therefore preempted if a FRSA regulation "substantially subsume[s]" the subject matter of the suit. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

---

[1] The action was first filed in the District Court of Adams County, Nebraska, but was removed to federal court on the basis of diversity jurisdiction.

[2] "Section 20106(a)(2) nevertheless creates a narrow exception to preemption through its savings clause. That clause allows a state to enact an otherwise preempted law or regulation directed at railroad safety or security if it '(A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce.' The purpose of the savings clause is to 'enable the states to respond to local situations not capable of being adequately encompassed within the uniform national standards.' H.R.Rep. No. 91-1194, at 11 (1970), reprinted at 1970 U.S.C.C.A.N. 4104, 4117." *Duluth, Winnipeg and Pacific Ry. Co. v. City of Orr*, 529 F.3d 794, 796 (8th Cir. 2008).

The FRSA preempts state tort claims concerning the adequacy of all warning devices installed with the participation of federal funds. *See Norfolk Southern Ry. Co. v. Shanklin,* 529 U.S. 344, 359 (2000) ("Once the FHWA [Federal Highway Administration] approved the project and the signs were installed using federal funds, the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject, thereby pre-empting respondent's claim."); *Bryan v. Norfolk and Western Ry. Co.,* 154 F.3d 899, 904 (8th Cir. 1998) ("[O]nce federal funds have been expended towards grade crossing safety devices, and those devices are installed and operating, state law negligence claims are preempted by federal regulations.").[3] BNSF's evidence conclusively proves that the B Street crossing was protected by federally funded advance warning signs and reflectorized crossbucks.[4] Grade's claims that BNSF was negligent in failing to install and maintain different types of warning devices at the B street crossing (negligence specifications (d), (f), (g), and (h)) are preempted by the FRSA.

Also preempted is the claim that a flagman or other railroad personnel should have been stationed at the B Street crossing to alert motorists that the crossing was blocked (negligence specification (d)). FHWA regulations define "active warning devices" to include "traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and *crossing watchmen*, all of which display to motorists positive warning of the approach or presence of a train." 23 C.F.R. § 646.204 (emphasis supplied). *See, e.g., Alabama Great Southern R. Co. v. Johnson*, 874 So.2d 517, 531 (Ala. 2003) (plaintiff's claim that train crew member should have flagged

---

[3] The applicable regulations are 23 C.F.R. §§ 646.214(b)(3) and (4).

[4] Grade contends a handwritten entry in one of BNSF's exhibits (filing 32-1, at 19) incorrectly identifies the Department of Transporting ("DOT") number for the crossing as "70-184-V" instead of "70-784 V." However, the exhibit correctly places the crossing near railroad mile post 1.04 in Hastings. The minor discrepancy regarding the DOT number does not create a genuine issue of material fact.

crossing was inadequate signalization claim preempted by FRSA).  Because the train was not moving when it was struck by Grade's vehicle, his claims that BNSF failed to maintain a proper lookout or to have its rolling stock under reasonable and proper control and supervision (negligence specifications (a) and (b)) necessarily coincide with this inadequate signalization claim and are likewise preempted.

Grade argues that fog and mist which substantially reduced visibility at the crossing created an "essentially local safety hazard" within the meaning of section 20106(a)(2)'s preemption exception.  For this exception to apply, there must be a "specific, individual hazard."  See *Easterwood*, 507 U.S. at 675 n. 15.  "Most courts examining the issue have held that adverse weather conditions do not constitute a specific, individual hazard."  *Kankakee, Beaverville & Southern R. Co. v. McLane Co., Inc.*, 2010 WL 3672228, *4 (N.D.Ind. Sep. 10, 2010) (holding FRSA preempted claim that railroad was negligent in failing to stop train in response to fog).  In fact, I previously have so held.  See *Security First Bank v. Burlington Northern*, 213 F.Supp.2d 1087, 1091 (D.Neb. 2002) (holding that winter conditions did not present specific, individual hazard).  I find no reason to hold differently in the present case.[5]

Grade also argues that BNSF's own operating rules specify that "[w]hen cars are shoved, kicked or dropped over road crossings at grade, a crew member must be on the ground at the crossing to warn traffic until the crossing is occupied." (Plaintiff's Exhibit 9 (filing 39-9), at 14 (Rule 6.32.1 of *General Code of Operating Rules* (5th ed. Apr. 3, 2005)).)  The FRSA does not preempt an action under State law

---

[5] Grade attempts to distinguish *Security First Bank* because it involved an excessive speed claim, but this is a distinction without a difference.  I stated in that case:  "While there is some evidence that visibility at the crossing was limited because of snow or blowing snow, . . . winter conditions such as this are not atypical 'aberrations which the Secretary could not have practically considered when determining train speed limits under the FRSA.'" 213 F.Supp.2d at 1091 (quoting *O'Bannon v. Union Pacific R. Co.*, 960 F.Supp. 1411, 1420 (W.D.Mo. 1997)).  The same can be said about the Secretary's determination of adequate warning devices.

-4-

seeking damages for personal injury, death, or property damage alleging that a party . . . has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by . . . the Secretar[y.]" 49 U.S.C. § 20106(2)(b)(1)(B).

Grade's argument fails for at least three reasons: (1) Plaintiff's Exhibit 9 has not been authenticated by affidavit and therefore cannot create a genuine issue of material fact. *See* Stuart v. General Motors Corp., 217 F.3d 621, 636 n. 20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed.R.Civ.P. 56(e). Documents which do not meet those requirements cannot be considered."); NECivR 7.0.1(b)(2)(C) ("An affidavit must identify and authenticate documents filed with the index [of evidence]. The affidavit must be made on personal knowledge, set forth facts that would be admissible in evidence, show affirmatively that the affiant is competent to testify to the matters stated, and identify the related motion."). (2) Even if the exhibit could be considered, the facts do not support application of the rule. There is no evidence any railcars were being "shoved, kicked, or dropped" over the crossing. To the contrary, the evidence establishes that the railcars were secured to the track with handbrakes while one locomotive was removed from the train in the Hastings yard. It is also undisputed that the crossing was occupied prior to Grade's arrival. (3) There is no showing the rule was created pursuant to a regulation or order issued by the Secretary of Transportation.

Grade claims the flatbed railcar he collided with should have been equipped with flashing lights or reflective devices (negligence specification (d)), but he has not demonstrated that such a requirement exists under Nebraska law. Even if there were such a requirement, this is a matter which is covered by the Secretary's regulations, *see* 49 C.F.R. §§ 224.1 to 224.111, and therefore preempted by the FRSA. Basically, the regulations require all cars manufactured after January 26, 2006, to be equipped with reflectorized sheeting before being placed in service, and establish a schedule for equipping existing cars. *See* 49 C.F.R. § 224.107. BNSF's evidence establishes

that the railcar in question was manufactured in 1999 and was not required to be reflectorized at the time of the accident.

Finally, Grade claims the act of blocking the crossing was itself negligence (specifications (c) and (e)), and he points to a regulation adopted by the Nebraska Department of Roads ("NDOR") which limits the amount of time that a railroad can block a crossing.[6] The NDOR regulation provides:

> A railroad company or a railroad track owner operating trains over tracks within the State of Nebraska shall not block a public highway-rail grade crossing, for a period of time in excess of ten (10) minutes, except if the train is moving in a continuous forward or backward direction, or if the train is stopped for an emergency condition, including an accident, derailment, critical mechanical failure, track or bridge washout, storm, flood, or other emergency situation.

Neb. Admin. Code Tit. 415, Ch. 7, § 005.01 (2006). The regulation also provides "[a] one-time exception of up to, but not exceeding, ten (10) additional minutes . . . [w]hen a train and its crew, operating under the rules of the Federal Railroad Administration (FRA) is unable to complete a switching maneuver while setting out or picking up rail cars within the ten (10) minutes set forth in Section 005.01 of this chapter." Neb. Admin. Code Tit. 415, Ch. 7, § 005.02A (2006). Unless an exception applies, "[t]rains blocking a public crossing for more than 10 minutes . . . shall break the train to provide access to the public." Neb. Admin. Code Tit. 415, Ch. 7, § 005.05 (2006). "When a train is cut or separated to prevent blocking of a highway-rail public grade crossing, the time required for re-coupling a train and performing air tests as

---

[6] The Nebraska Public Service Commission also adopted a regulation which provides, subject to certain exceptions, that "[s]tanding trains, parked or stored cars, locomotives, equipment and switching movements shall not block a public or private crossing longer than ten (10) minutes after a person appears and wants to cross a crossing, . . .." Neb. Admin. Code Title 291, Ch. 4, § 002.09D (2006). This regulation does not apply to the facts of this case because there is no evidence any person was waiting at the B Street crossing before the accident.

required by the FRA will not be considered a violation of this section." Neb. Admin. Code Tit. 415, Ch. 7, § 005.03 (2006).

BNSF suggests the switching maneuver exception applies because one of the train's locomotives was set out at the Hastings yard. Even if locomotives qualify as a "rail cars" for purposes of the exception, however, there is a genuine issue regarding the length of time the B Street crossing was blocked before the accident occurred. The regulation permits a crossing to be blocked a maximum of 20 minutes when a switching maneuver is involved.

Data downloaded from an event recorder on one of the train's locomotives indicates that:

> At 10:07 p.m., the train stopped briefly to allow the conductor to line a switch. It then moved forward at 10 miles per hour or less to the house track where it stopped at 10:34 p.m. At that point, the locomotives were detached from the railcars and moved onto a house track to allow the third locomotive to be set out.

(Affidavit of Gregory G. Golden (filing 33-1), ¶ 23.) The evidence does not show when the B Street crossing first became blocked by the train while in motion. "When [the] train . . . stopped on the track that it occupied at the time of the accident, it blocked all three of the A, B, and D Street crossings because of its length." (*Id.*, ¶ 27.)

The train's conductor states: "At approximately 10:50 p.m., I became aware that someone had run into [the train] at the B Street crossing in Hastings, Nebraska, when I heard about the accident on my radio while walking to the yard office." (Affidavit of Cale Lucky (filing 33-2), ¶ 6). The police report indicates the accident did not occur until one-half hour later at 11:20 p.m. (Investigator's Motor Vehicle Accident Report (filing 39-3), at 1.) There is evidence another vehicle collided with the same train at approximately 10:30 p.m. that evening, but at the A Street crossing. (Affidavit of Kevin Ehly (filing 39-4, ¶ 10.) The time indicated in the police report is consistent with testimony provided by Grade's wife, who was a passenger in the

vehicle. She testified the couple had been grocery shopping immediately before the accident, and had left the store at about 11:15 p.m. (Filing 33-5, at 26.)[7]

Under Nebraska law, "the violation of a safety regulation, established by statute or ordinance,[8] is not negligence as a matter of law, but is evidence of negligence which may be considered in connection with all the other evidence in the case in deciding the issue." *Orduna v. Total Const. Services, Inc.*, 713 N.W.2d 471, 479 (Neb. 2006). "[T]he rule cannot be made applicable unless there is some causal relation between the violation and an accident." *Suiter v. Epperson*, 571 N.W.2d 92, 103 (Neb.App. 1997); *Crandall v. Ladd*, 7 N.W.2d 642, 647 (Neb. 1943).

"Under Nebraska negligence law, proximate cause consists of three elements: that (1) but for the negligence, the injury would not have occurred, (2) the injury is the natural and probable result of the negligence, and (3) there is no efficient intervening cause." *Heatherly v. Alexander*, 421 F.3d 638, 641-42 (8th Cir. 2005) (citing *Shelton v. Bd. of Regents of the Univ. of Neb.*, 320 N.W.2d 748, 752 (1982)). "Although the determination of causation is ordinarily a question of fact, where only one inference can be drawn, it is for the court to decide whether a given act or series of acts is the proximate cause of the injury." *Stahlecker v. Ford Motor Co.*, 667 N.W.2d 244, 258 (Neb. 2003). I conclude there is not sufficient evidence to prove either of the first two elements of proximate cause.[9]

---

[7] BNSF correctly notes that the police report is not authenticated by affidavit. However, Ms. Grade's deposition testimony is included in an exhibit filed by BNSF, and is properly authenticated.

[8] The NDOR regulation was adopted as part of "a comprehensive public safety program to deal with problems associated with public and private highway-rail grade crossings." Neb. Rev. Stat. § 74-1342 (Westlaw 2010).

[9] I am unable to resolve as a matter of law the question of Grade's alleged contributory negligence. "Under the current standard, to obtain summary judgment on the issue of contributory negligence, the defendant has the burden to prove, under the facts viewed most favorably to the plaintiff, that the contributory negligence of

Obviously, the accident would not have occurred but for the fact that the train was in the crossing. It is also possible the accident would not have occurred but for the fact that the train was standing still, which might have made it less noticeable to a motorist. But these facts alone do not establish a breach of duty on BNSF's part. "A railroad company has the right, in its reasonable and ordinary course of business, and under proper conditions, to stop its trains upon crossings at highways, even though it blocks traffic and temporarily excludes the use of the highway over the crossing by those traveling thereon." *Sailors v. Lowden*, 299 N.W. 510 (Neb. 1941).[10] "In this state a railroad company may properly leave its cars standing on a highway crossing for short periods when necessary for the reasonable conduct of its business. But to leave such cars in or upon the highway longer than necessary for such purpose is negligence." *Luedeke v. Chicago & N.W. Ry. Co.*, 231 N.W. 695, 697 (Neb. 1930) (citing *Chicago, B. & Q. R. Co. v. Roberts*, 91 N. W. 707 (Neb. 1902)).[11] If BNSF

---

the plaintiff is equal to or greater than the negligence of the defendant as a matter of law." *Dutton v. Travis*, 551 N.W.2d 759, 762 (Neb.App. 1996) (citing Neb. Rev. Stat. § 25-21,185.09). Even though Grade did not see the flatbed railcar before the collision, the "indiscernible object" exception to the range of vision rule might apply. *See McFadden v. Winters and Merchant, Inc.*, 603 N.W.2d 31, 38-39 (Neb.App. 1999). The applicability of such exception presents a jury question. *See id.*

[10] In *Sailors*, the plaintiff was a passenger in an automobile that was involved in a nighttime collision with a standing freight train. Shortly before the accident, the freight train was switched from the main track onto a passing track in order to allow a passenger train through on the main track. The accident happened before the rear brakeman was able to walk to the crossing to cut the train. The Nebraska Supreme Court determined the railroad should have been granted a directed verdict because "[t]he train standing on the crossing was not a cause of the accident, but merely a condition making the accident possible." 299 N.W. at 512.

[11] In *Luedeke*, a train blocking a crossing prevented firemen from responding quickly to a fire. The Nebraska Supreme Court held there was sufficient evidence to support a jury verdict that the railroad was negligent, and that the delay it occasioned was a proximate cause of the fire destroying a building. In *Roberts*, a train partially blocking a crossing was held not to be a proximate cause of a team of horses taking fright when a handcar suddenly appeared from behind the train on another track.

was negligent, it was only because the crossing was blocked for an unreasonable length of time, as evidenced by the alleged violation of the NDOR regulation.[12]

However, there no reasonable basis to conclude that the accident would not have happened even if Grade had arrived at the B Street crossing immediately after the train stopped at 10:34 p.m. "[T]he defendant's conduct is not a cause of the event if the event would have occurred without it." *Stahlecker*, 667 N.W.2d at 254 (quoting *Haselhorst v. State*, 485 N.W.2d 180, 187 (Neb. 1992)). Even though BNSF may have been negligent in allowing the train to stand in the crossing for however long it did, such negligence was not a "but for" cause of the accident. *See, e.g.*, *Webb v. Oregon, Washington R. & Nav. Co.*, 80 P.2d 409, 411 (Wash.1938) ("[W]e are convinced that the fact that the train remained two minutes longer than the time permitted by the ordinance must be regarded as merely a condition of the accident, not a cause thereof. The same result would have happened had the appellant reached the crossing three minutes earlier."); *Hendley v. Chicago & N.W. Ry. Co.*, 225 N.W. 205, 206 (Wis. 1929) ("We see no causal connection between the alleged violation of this provision and the injury to the plaintiff upon which could be predicated a liability of the defendant railroad company. It is clear that it was not because of the standing of the train the extra 5 minutes beyond the statutory 10 minutes that could

---

[12] Of course, the alleged violation of the NDOR regulation may not be the only evidence of such negligence. *See Luedeke*, 231 N.W. at 697-98 ("In order to hold the company responsible, it must appear that the negligence in blocking the crossing was the proximate cause of the damage. Trainmen in charge of trains and the public have taken widely divergent views as to the length of time a crossing may reasonably be blocked, and have frequently been notoriously and wantonly indifferent to the right of the public to use such crossings. . . . Such conduct as this has resulted in legislative enactments, under the police power, limiting the time a crossing might be blocked. Stanton has such an ordinance which limited the time to five minutes which a train might block a street crossing. . . .We have repeatedly held that the violating of such an ordinance is to be considered by the jury as evidence of negligence. But, aside from a violation of the ordinance, the question of negligence is to be determined from the circumstances of the case.") (citation omitted).

make the railroad company responsible. The same result would have followed had this crossing been approached by plaintiff 7 minutes earlier. The lapse of time therefore went no further than to create the condition in which the accident occurred as distinguished from the cause thereof."); *Jones v. Atchison, T. & S.F. Ry. Co.*, 282 P. 593, 593-94 (Kan. 1929) ("The petition alleged that defendant unlawfully obstructed the crossing with its freight train for 45 minutes. . . . It made no difference to plaintiff how long the train had been there. He did not arrive and then wait because the crossing was obstructed, or resort to expedients to avoid delay in getting to the other side of the track, or do or suffer anything because of length of time the train had stood on the crossing. To him the situation was the same as if the train had been there only 5 minutes, and negligence with respect to him may not be predicated on violation of the statute [making it a misdemeanor for a railway company to allow a train to stand on a highway crossing for longer than 10 minutes]."); *Orton v. Pennsylvania R. Co.*, 7 F.2d 36, 37-38 (6th Cir. 1925) ("There is nothing in the evidence to show that [the railroad] was unnecessarily using [the crossing]. But, if the statute may be said to limit the right of occupancy by necessity and for legitimate purposes to 5 minutes, it would nevertheless seem obvious that the additional use, even if negligent, was an incident and not a concurring proximate cause of the accident."); *Gilman v. Central Vermont Ry. Co.*, 107 A. 122, 125 (Vt. 1919) ("As to the controversy concerning the length of time that the crossing had been obstructed, it is enough to say that it is wholly immaterial whether the train had been standing there more than five minutes, or whether it had merely paused for a few seconds. . . . If the defendant had occupied the crossing more than five minutes in violation of the statute (G.L. 5177), it was not, in the circumstances, evidence of negligence, for it was only a condition and not the proximate cause of the accident. Assuming that the train had occupied the crossing for an unlawful length of time, plaintiff was not injured thereby.").

It also has been held that the purpose of a law limiting the length of time a train may block a crossing is to prevent traffic delays, not to prevent collisions between motorists and standing railcars. *See Fox v. Illinois Central R. R. Co.*, 31 N.E.2d 805,

808 (Ill.App. 1941) (fact that train blocked crossing for over 20 minutes, in violation of state law, was not proximate cause of collision); *Simpson v. Pere Marquette Ry. Co.*, 268 N.W. 769, 770 (Mich.1936) ("The purpose of the five-minute rule is to prevent blocking the highway and has no applicability to the alleged negligence in this case" where the automobile in which the plaintiff was a passenger collided with a train that had stood across the highway for more than 5 minutes, in violation of state law); *Jones v. Texas & P. Ry. Co.*, 154 So. 768, 769 (La.App. 1934) ("It may very well be that there are regulations or city ordinances, which require trains to open up a crossing after a certain period of time so as not to unduly delay traffic on the street or highway, but these would have no connection with the issue of negligence that is here raised by the plaintiff" in a case involving an automobile-train collision); *Jones v. Atchison, T. & S.F. Ry. Co.*, 282 P. at 593-94 ("The statute is one to facilitate the movement of traffic on the highway and to prevent blockade, causing congestion and delay. The statute was not one to prevent autotruck drivers from running against the sides of freight trains."). These cases indicate that a collision with a motor vehicle is not a natural and probable result of a train blocking a crossing. For example, in *Pennsylvania R. Co. v. Huss*, 180 N.E. 919, 922 (Ind.App. 1932), it was held that although a violation of Indiana's "anti-blocking" statute was negligence *per se*, the resulting accident was not reasonably foreseeable:

> Can it be said, upon a consideration of the evidence in this case, that appellant, in the exercise of ordinary care, should have anticipated that, in the natural course of events and according to common experience, the driver of some automobile using the highway which intersects its railroad tracks would or might attempt to cross over the tracks at a time when the same was occupied by a freight car forming a part of one of its trains? Was there any negligence charged in the complaint and proven by the evidence that was a proximate cause of appellee's injuries? We are of the opinion that these questions must be answered in the negative. Certainly it cannot be reasonably said that it is usual for the driver of an automobile, traveling over the highways of this state, to run into a freight train standing over a crossing, or that such an event is likely to occur.

-12-

No reasonable jury could find that the accident would not have occurred but for BNSF's alleged negligence in allowing the train to block the crossing for too long, or find that Grade's injuries were a natural and probable result of such negligence. I do not reach the issue of whether the claim also is preempted by federal law.

Grade's wife has assigned to him a claim for loss of consortium, which, under Nebraska law, is a derivative claim that is dependent upon the success of Grade's underlying tort claims.

> Damages for loss of consortium represent compensation for a spouse who has been deprived of rights to which he or she is entitled because of the marriage relationship, namely, the other spouse's affection, companionship, and assistance and particularly his or her conjugal society. Although loss of consortium is a personal legal claim which is separate and distinct from those claims belonging to the injured spouse, a loss of consortium claim derives from the harm suffered by the injured spouse. The rights of recovery by the uninjured spouse are based upon the injured spouse's right to recover for direct injuries. Not only must there be an injury to the injured spouse, but also there must be a compensable injury, that is, an injury for which the defendant is liable.

*Erickson v. U-Haul Int'l*, 767 N.W.2d 765, 774 (Neb. 2009). This assigned claim therefore will be dismissed along with Grade's personal claims.

Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (filing 30) is granted, and the plaintiff's action is dismissed with prejudice. Judgment will be entered by separate document.

October 28, 2010.          BY THE COURT:

                           *Richard G. Kopf*
                           United States District Judge

---

\* This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.